```
                  UNITED STATES DISTRICT COURT
                           FOR THE
                     DISTRICT OF VERMONT

UNITED STATES OF AMERICA,       :
                                :
                                :
          v.                    :     Case No. 2:06-cr-39
                                :
JOHN BYORS,                     :
                                :
          Defendant.            :
```

## Memorandum and Order

Defendant John Byors has moved to dismiss the indictment, and to strike the panel of prospective petit jurors, on the grounds that the Jury Plan of the District of Vermont permits the systematic exclusion of African Americans from grand and petit juries, in violation of his Sixth Amendment right to juries comprising a fair cross-section of the community and the Jury Selection and Service Act, 28 U.S.C. § 1861-69 ("JSSA").

### I.   Procedural History

A criminal complaint was filed against Byors on December 20, 2005, and on April 13, 2006 a federal grand jury in the District of Vermont indicted him on charges related to a scheme to obtain lenders or investors for a marble quarrying business.  After a plea agreement collapsed, Byors sought and was granted leave to file additional pre-trial motions on June 20, 2007, including a Motion to Inspect Contents of Records or Papers in Connection with Grand and Petit Jury Selection Process (Doc. 60).  At a hearing on October 10, 2007, the Court granted the motion to inspect.  The Court also reserved the month of March 2008 for

trial, and required that any additional motions be filed within thirty days from arraignment on an expected superseding indictment.

On December 5, 2007 a federal grand jury handed down a superseding indictment, which charged Byors with forty-two counts including mail and wire fraud, bank fraud, obstruction of justice and criminal contempt.  On January 10, 2008 Byors moved to dismiss the indictment and to strike the panel of prospective jurors (Doc. 73).  In support of his motion Byors submitted a copy of the District of Vermont's 2006 Plan for the Random Selection of Grand and Petit Jurors for Service within the District of Vermont ("Plan"); a copy of the Report on Operation of the Jury Selection Plan dated February 14, 2002 ("2002 Report"); a copy of the Report on Operation of the Jury Selection Plan dated April 20, 2006 ("2006 Report"); and an Affidavit in Support of Statutory Challenge to Jury Selection Process in the District of Vermont, pursuant to 28 U.S.C. § 1867(d).

A federal grand jury handed down a second superseding indictment on January 16, 2008.  On February 8, 2008, the Court heard argument on Byors' challenge to the jury selection plan. Byors relied on his previously filed submissions.  Neither party presented any testimony or additional evidence.  At the hearing, Byors for the first time requested an opportunity to obtain the assistance of a statistician to support his claim.  The Court

required him to give notice by February 11, 2008, whether he wished to join with other defendants who have raised similar issues and already secured expert statistical assistance. On February 12, 2008, Byors filed a Motion to Join in Jury Challenges Raised in United States v. Brown and Lavandier and United States v. Shine (Doc. 84), and requested a continuance of the trial date. The government opposes a continuance.

## II.  The Motion to Join

The Court **denies** the motion to join and to continue the trial date. The trial has been scheduled since October 2007 for the month of March 2008. The Government's case involves numerous out-of-state witnesses who would be difficult to reschedule at this late date. Moreover, the defense knew of the pending jury selection challenges and requests for appointment of experts in the other cases long before the February 8 hearing date, yet elected to proceed on its own submissions until midway through the hearing, when the request to secure the assistance of a statistician was made. There was no hint prior to that point that Byors needed additional time to supplement the briefing or to obtain witnesses.

## III. The Motion to Dismiss

For the reasons that follow, the motion to dismiss indictment (Doc. 73) is **denied without prejudice,** on the ground that Byors has not met his burden of showing a prima facie

violation of the fair cross-section requirement.  This ruling is based on the evidence produced in this case alone.  Should the pending motions in *United States v. Lavandier* and *Brown*, 2:06cr82, and *United States v. Shine*, 2:05cr25, result in a ruling that the District's jury selection process violates the Jury Selection and Service Act or the Sixth Amendment to the United States Constitution, Byors may reassert his claim and the Court will consider it in light of the submissions made in those cases as well as this one.

    **A.**    **The District of Vermont's Jury Selection Plan**

Pursuant to the JSSA, the United States District Court for the District of Vermont adopted a plan for random selection of grand and petit jurors on June 27, 2006.  The Plan was approved by the Second Circuit on July 18, 2006, and became effective on that day.

The Plan provides for three jury divisions within the District of Vermont: Northern (including the counties of Caledonia, Chittenden, Essex, Orleans, Franklin, Grand Isle, Lamoille and Washington); Southeastern (including the counties of Orange, Windham and Windsor) and Southwestern (including the counties of Addison, Bennington and Rutland).  *See* Plan ¶ 6.

The Plan requires the clerk of court to maintain a separate master jury wheel for each division, each wheel consisting of a minimum of five thousand names.  *Id.* ¶ 8.  The source of names

4

for the master jury wheels are the voter registration checklists for the fourteen counties.  *Id.* ¶ 7.  The cities and towns in each of the jury divisions are proportionally represented in the master jury wheels, provided that a minimum of two names are included from each city, town or gore.[1]  *Id.* ¶ 9.  The master wheels are emptied and refilled every four years between January 1 and July 1 following a presidential election, and may be refilled sooner if demands upon the wheel have been excessive or the wheel may become exhausted prior to the next refill.  *Id.* ¶¶ 8, 10.

From each master wheel names are drawn randomly for jury service within each division.  *Id.* ¶ 11.  In a "one-step summoning" process, the clerk mails to every person selected a juror qualification questionnaire, to be returned within ten days.  *Id.*  Any citizen is eligible to serve as a grand or petit juror unless he or she (1) is under eighteen years of age; (2) has not resided within the District for one year; (3) is unable to read, write and understand the English language with a degree of proficiency sufficient to satisfactorily complete the juror qualification form; (4) is unable to speak the English language; (5) is incapable, by reason of mental or physical infirmity, to render satisfactory jury service; or (6) has a charge pending

---

[1] In Vermont, a gore is an unincorporated part of a county that is not part of any city or town.

against him or her for the commission of, or has been convicted in a state or Federal court of record of, a crime punishable by imprisonment for more than one year and civil rights have not been restored.  *Id.* ¶ 12.  The Plan exempts members in active service in the armed forces of the United States; active, full-time members of the fire or police departments; and public officers in the executive, legislative or judicial branches of the federal, state or local governments who are actively engaged in the performance of official duties.  *Id.* ¶ 13.  Upon request, the Court may also excuse members of certain classes or groups on the ground of undue hardship or extreme inconvenience.  *Id.* ¶ 14.

Every four years, after the master wheel is emptied and refilled, the district court submits a report on the jury selection process, pursuant to 28 U.S.C. § 1863(a).  The report provides general information about the master jury wheel; race, ethnicity and gender data from a sampling of returned juror questionnaires; and a statistical comparison of the sample against citizen population data.

The 2006 Report shows that of 750 returned questionnaires, none reported race as "Black or African American."[2]  The 2002 Report shows that of 518 returned questionnaires, one individual

---

[2]  Five in the sample reported race as "Other," and one reported race as "Multi-Racial."  In the sample of returned questionnaires 143 individuals elected not to provide racial information.

6

reported her race as "Black or African American."[3]  In the District of Vermont, as of the 2000 census, the African American population aged 18 years and over numbered 0.4% of the total adult population.

### B. The Sixth Amendment Guarantee of a Fair Cross-Section

The Sixth Amendment guarantees a defendant in a criminal trial the right to a jury chosen from a fair cross-section of the community. *Taylor v. Louisiana*, 419 U.S. 522, 530 (1975).  To establish a prima facie violation of the fair cross-section requirement, a defendant must show 1) the group alleged to be excluded is a "distinctive" group in the community; 2) the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and 3) this underrepresentation is due to systematic exclusion of the group in the jury selection process. *Duren v. Missouri*, 439 U.S. 357, 364 (1979).  The same test applies for proof of a violation of the JSSA. *United States v. Miller*, 116 F.3d 641, 659 (2d Cir. 1997).

There is no dispute that African Americans are a distinctive group in the community. *See United States v. Rioux*, 97 F.3d 648, 654 (2d Cir. 1996) ("Blacks and Hispanics are unquestionably 'distinctive' groups for the purposes of a fair-cross-section

---

[3]  Three individuals reported their race as "Other," and 87 elected not to provide racial information.

analysis"). For the second prong of a prima facie case, a defendant must first demonstrate the percentage of the group alleged to be underrepresented, and then show that the representation of this group in jury venires is not fair and reasonable. *See Duren*, 439 U.S. at 364. A gross discrepancy between the percentage of the group in the venires and the percentage of the group in the community will indicate that the group is not fairly represented. *Id.* at 365-66. For the third prong, a defendant must show that the cause of the underrepresentation is systematic--that is, inherent in the jury selection process. *Id.* at 366.

    **C.    Discussion**

Byors provided the following analysis of his statistics. Out of a total number of 1,268 sampled prospective jurors, one identified as African American. This represents .079% of the sample. According to the 2000 census, .4% of the adult population in the district were African Americans. The sampled actual number thus represents 19.7% of the expected number of prospective African American jurors in the district. By this analysis 80.3% of the potential jurors who were African American were missing from the jury pool.

The Second Circuit has conditionally approved the use of the absolute disparity/absolute numbers statistical approach to assessing underrepresentation. *See Rioux*, 97 F.3d at 655-656.

This method "measures the difference between the group's representation in the general population and the group's representation in the qualified wheel." *Id.* at 655.  Thus if African Americans make up .4% of the population, but only .079% of the pool, the absolute disparity is .321%.

The *Rioux* panel acknowledged a central flaw in this approach when evaluating a distinct group that is a tiny percentage of the entire population, however.  *See id.*; *see also United States v. Biaggi*, 909 F.2d 662, 678 (2d Cir. 1990) ("The risk of using this approach is that it may too readily tolerate a selection system in which the seemingly innocuous absence of small numbers of a minority from an average array creates an unacceptable probability that the minority members of the jury ultimately selected will be markedly deficient in number and sometimes totally missing.").  Byors urges the Court not to assess his challenge under the absolute numbers approach, tacitly acknowledging that the level of underrepresentation using this approach would not violate the Sixth Amendment.  He fails, however, to offer an alternative statistical approach, other than to argue that the current system has excluded 80% of potential African American jurors, resulting in an intolerable level of underrepresentation.

Byors' evidence of underrepresentation falls short of that required to conclude that the representation of African Americans

in jury venires in this district is not fair and reasonable. A conclusion that 80% of potential African American jurors were excluded from this district's venires is undeniably cause for grave concern, but the Court cannot draw such an inference from the scant information and analysis presented. Were the insufficiency of his statistics the only defect in his argument, the Court would be inclined to allow Byors to join the jury challenges raised in the other cases pending before this Court, and to supplement his submissions with a more thorough analysis.

Even if Byors could satisfy the substantial underrepresentation prong of *Duren*, however, he has not presented a prima facie case that such an underrepresentation is due to systematic exclusion. The source of names for the master jury wheels are the voter checklists of the communities within the jury divisions. The names are drawn randomly from the master wheel for each jury division. Byors does not suggest that there is systematic exclusion in any part of the process of selection, but that "the systematic exclusion in this case results from the District's exclusive reliance on voter registration lists, as opposed to a combination of voter registration lists and motor vehicle registration lists." Def.'s Mot. 7.

In support of this assertion he refers anecdotally to state court litigation from 1989 in which a study compared the voter list of Chittenden County with the population of the county as a

whole.  Ultimately the county changed its jury selection method to include Department of Motor Vehicle data as well as voter checklists as a source of names for its juries.  The Court has not been provided with any evidence of the study's findings, or evidence from any other source that suggests that randomly drawing prospective jurors exclusively from voter registration lists results in systematic exclusion of any distinctive group.

The use of voter registration lists has been consistently approved as a source of names for a jury wheel constituting a fair cross-section of the community.  *See, e.g., United States v. Gonzalez-Velez*, 466 F.3d 27, 39 (1st Cir. 2006); *United States v. Orange*, 447 F.3d 792, 800 (10th Cir. 2006); *United States v. Morin*, 338 F.3d 838, 843-44 (8th Cir. 2003); *Truesdale v. Moore*, 142 F.3d 749, 755 (4th Cir. 1998); *United States v. Guy*, 924 F.2d 702, 707 (7th Cir. 1991); *Biaggi*, 909 F.2d at 678.  If the Court were to employ any other source of names other than or in addition to voter registration checklists, it would have to justify with specificity the need to supplement the voter registration lists to obtain a fair cross-section of the community.  *See* Plan ¶ 9.  The current record does not supply the Court with that justification.

Byors argues circularly that because the current system results in underrepresentation of African Americans, this constitutes systematic exclusion under *Duren*.  Accepting such an

11

argument would relegate *Duren's* third prong to surplusage. Moreover, as the Second Circuit has observed, "it remains unclear whether statistics alone can prove systematic exclusion[;] . . . if they can . . . they would have to be of an overwhelmingly convincing nature." *Rioux*, 97 F.3d at 658.  Without some evidence that exclusive use of voter registration lists in the District of Vermont results in systematic exclusion of African Americans from the District's master jury wheel, Byors has failed to present a prima facie violation of the fair cross-section requirement.

Accordingly, his motion is **denied without prejudice**.


Dated at Burlington, in the District of Vermont, this 15th day of February, 2008.


/s/ William K. Sessions III
William K. Sessions III
Chief Judge
 U.S. District Court